ORIGINAL

AO 91 (Rev. 11/82)                    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>CHRISTOPHER VAN HOLTON, ET AL. | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>**19MJ00878** |

Complaint for violation of Title 21, United States Code, Section 846: Conspiracy to Distribute Methamphetamine

| NAME OF MAGISTRATE JUDGE<br>**HONORABLE GAIL J. STANDISH** | **UNITED STATES MAGISTRATE JUDGE** | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>March 4, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 846]

Beginning at a time unknown and continuing to on or about March 4, 2019, in Los Angeles County, in the Central District of California, and elsewhere, defendants CHRISTOPHER CANION VAN HOLTON, JERRELL EUGENE ANDERSON, ADAN SEPULVEDA, KENNETH LASHAWN HADLEY, and JACKIE WALTER BURNS, together with others known and unknown, conspired and agreed with each other to knowingly and intentionally distribute at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21 United States Code, Sections 841(a)(1), (b)(1)(B)(viii) .

LODGED

2019 MAR -5 PM 1:03

FILED
CLERK, U.S. DISTRICT COURT
MAR - 5 2019
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:  (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**BRENT JAMES** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>March 5, 2019 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA: ROBYN K. BACON x4667          REC: DETENTION

## AFFIDAVIT

I, Brent James, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for a criminal complaint against and arrest warrant for CHRISTOPHER CARION VAN HOLTON (DOB 10/87), JERRELL EUGENE ANDERSON (DOB 7/90), ADAN SEPULVEDA (DOB 12/92), KENNETH LASHAWN HADLEY (DOB 9/87), and JACKIE WALTER BURNS (DOB 9/98) for a violation of 21 U.S.C. § 846: Conspiracy to Distribute Methamphetamine.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND FOR SPECIAL AGENT BRENT JAMES

3.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since December 2016.  I am currently assigned to the Los Angeles Division to a group working hi-tech organized crime and intellectual property rights violations.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   INVESTIGATION OF THE DARKNET MARKETPLACE ("DNM") VENDOR DRUGPHARMACIST**

4.   On or about March 4, 2019, in case number 19-MJ-802, United States Magistrate Judge Maria A. Audero signed a search warrant authorizing the search of the person of Adan SEPULVEDA. A true and correct copy of the affidavit in support of that search warrant is attached as Exhibit 1 and incorporated herein. In summary, the affidavit states:

a.   Since June 2018, the United States Postal Inspection Service ("USPIS"), FBI and other agencies have been investigating the "drugpharmacist," a Los Angeles-based darknet marketplace ("DNM") vendor selling methamphetamine, heroin, and other drugs on the marketplaces Dream and Wall Street Market. Shipments from the drugpharmacist have certain common features – they are shipped in USPS Tyvek envelopes with postage paid (until recently) by Easypost; inside the Tyvek envelope, there is a bubble mailer, inside of which there is a stuffed animal and usually a Thank You card; and inside the stuffed animal, there is a clear plastic container with the drugs.  To date, USPIS has identified hundreds of suspected drugpharmacist shipments, including heroin sent to Knoxville, Tennessee that led to the overdose death of victim J.W.

b.   SEPULVEDA, ANDERSON, VAN HOLTON, and HADLEY are members of the drugpharmacist drug trafficking organization ("DTO") who have packaged drugs, mailed drug parcels, and purchased shipping supplies.  In particular:

i.   On August 7, 2018, SEPULVEDA mailed drugs to drugpharmacist customers, including the heroin that caused the overdose death of J.W. in Knoxville;

ii.  On August 20, 2018, ANDERSON and VAN HOLTON purchased packaging supplies; SEPULVEDA mailed multiple parcels, including one containing 1.3 grams of cocaine base; and VAN HOLTON and ANDERSON mailed multiple parcels, including one containing 7.7 grams of methamphetamine;

iii. On August 24, 25, and 26, 2018, VAN HOLTON and ANDERSON purchased shipping supplies; and

iv.  On September 13, 2018, HADLEY mailed multiple parcels, including an undercover purchase containing approximately 28 grams of actual methamphetamine.

c.   Multiple undercover drug purchases and surveillance have confirmed that drugpharmacist and a related DNM vendor, rickandmortyshop, have continued operating through early March 2019, and that ANDERSON and SEPULVEDA have been using rental properties as stash houses, i.e., secure and private locations in which they package drug for delivery to customers through the U.S. mail.  In particular,

i.   On or about February 27, 2019, surveillance agents saw SEPULVEDA, ANDERSON and a third man leave an Airbnb rental in Los Angeles.  SEPULVEDA and the unidentified man were carrying large black suitcases that they placed in the trunk of a Ford Focus belonging to Melissa White, ANDERSON's girlfriend. ANDERSON and White placed a black duffel back and a green

backpack into a Honda Accord leased in both their names.   Then
both cars left the area.

         ii.   On or about February 28, 2019, cellular data
placed ANDERSON in the vicinity of a blue postal collection box
in Glendale where multiple suspected drug shipments were dropped
off.

**B.**    **ANDERSON, SEPULVEDA AND BURNS ARE ARRESTED ON MARCH 4, 2019 LEAVING A STASH HOUSE IN GLENDALE**

    5.   Through my discussions with other investigators, my
own investigation, and my review of reports, I know the
following:

    a.   On March 4, 2019, using cell-site data, GPS data,
and a cell-site simulator, pursuant to federal search warrants,
surveillance agents located ANDERSON's phone at an open-air
apartment complex in Glendale on Valley View Rd. ("the Valley
View Complex").  Agents were not able to determine which
apartment in the Valley View Complex ANDERSON had entered.

    b.   At approximately 1 p.m., while ANDERSON was
inside the Valley View Complex, drugpharmacist logged into the
Dream marketplace.  Based on my experience in this
investigation, I believe that ANDERSON was using the Valley View
Apartment as a stash house and logged into Dream in order to
collect customer drug orders and prepare drugs for shipment.

    c.   At approximately 2 p.m., surveillance saw a Ford
Focus, California license plate 8BPM565, that they recognized as
a car used by ANDERSON, leave the Valley View Complex.  Agents
began to follow the Ford.  As they were doing so, the Ford

stopped and SEPULVEDA, ANDERSON, and a man later identified as
BURNS exited the car and approached the surveillance agents'
car.  At that time, surveillance was terminated and all three
occupants of the Ford were detained.  ANDERSON and SEPULVEDA
were then placed under arrest.

        d.    After BURNS was detained, USPI Wilford Claiborne
spoke to him.  USPI Claiborne advised BURNS of his Miranda
rights and BURNS agreed to talk.  USPI Claiborne asked BURNS
which apartment in the Valley View complex he had been in.
BURNS said he could not recall, but he offered to show USPI
Claiborne.  At that time, USPI Claiborne drove BURNS back to the
Valley View complex and BURNS directed him to Apartment 31,
i.e., the Valley View Apartment.

        e.    On or about March 4, 2019, in case number 19-MJ-
831, US Postal Inspector Jonathan Ramirez obtained a search
warrant for the Valley View Apartment.  That evening, FBI and
USPIS executed the search warrant.  Inside a closet in the
living room, agents found a large black suitcase and a green
Adidas backpack.  Inside the green backpack, there was a loaded
black Glock 29 10mm pistol and a black Apple laptop computer.
In another compartment of the backpack, there was a State of
Washington License to Carry Concealed Pistol permit bearing the
name Jerrell Eugene Anderson.  The black suitcase contained the
following:

        i.    A vacuum sealed bag with tape containing a
white crystal-like substance that field tested positive for
methamphetamine and weighed approximately 128 gross grams,

ii.   Two vacuum sealed bags containing a brown powder substance which was field tested a presumptive positive for heroin and weighed approximately 65 gross grams,

iii. A plastic bag containing a gray powder substance suspected to be heroin weighing approximately 39 gross grams,

iv.   A vacuum sealed bag with tape containing a black like substance suspected to contain heroin weighing approximately 42 gross grams,

v.   A small plastic container containing a brown rock like substance suspected to contain heroin weighing approximately 24 gross grams,

vi.   A small plastic bag containing a black rock like substance suspected to contain heroin weighing approximately 14 gross grams,

vii. A small plastic container containing a white powder substance that field tested positive for cocaine and weighed approximately 25 gross grams

viii.     Packaging supplies, namely, USPS envelopes, bubble mailers, plastic containers, super glue, hot glue, latex gloves, Dymo Label printer, and stuffed animals.

f.   During a Mirandized post-arrest interview, BURNS said that, on previous occasions in August and in the previous week, he had helped SEPULVEDA and ANDERSON package drugs for shipping through the mail at an Airbnb rental.

//

## IV. <u>CONCLUSION</u>

6.    For all the reasons described above, there is probable cause to believe that VAN HOLTON, ANDERSON, SEPULVEDA, HADLEY, and BURNS committed a violation of 21 U.S.C. § 846.

_____
BRENT JAMES, Special Agent
FEDERAL BUREAU OF
INVESTIGATION

Subscribed to and sworn before me
this 5th day of March, 2019.

_____
HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>ADAN SEPULVEDA | )<br>)<br>)<br>)<br>)<br>)    Case No.    19-MJ-802 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____Central_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute and Distribution of Controlled Substances |
| 21 U.S.C. § 843(b) | Use of a Communications Facility |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime |

The application is based on these facts:

See Attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: » _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

<br>

_____
*Applicant's signature*

Jonathan M. Ramirez, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles _____
*Printed name and title*

AUSA: Robyn K. Bacon ((213) 894-4667)

## ATTACHMENT A-1

PERSON TO BE SEARCHED:

The person to be searched is ADAN SEPULVEDA, date of birth December 8, 1992, California Driver's License Number F2805715, approximately 5'9" with black hair and brown eyes.

The search of the aforementioned person shall include ANY AND ALL clothing and personal belongings, including any digital devices, backpacks, wallets, briefcases and bags that are within SEPULVEDA's immediate vicinity and control at the location where the search warrant is executed.  It shall not include a body cavity or strip search.

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy); 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances); 21 U.S.C. § 843(b) (Use of a Communications Facility); and 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) (the "Subject Offenses"), namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.    Documents and records related to the purchase of stuffed animals;

d.    Firearms and ammunition;

e.    U.S. Mail, Express Mail, Priority Mail, United Parcel Service (UPS), Federal Express or other private shipping service's delivery confirmation slips, labels and associated boxes (to include any packages and envelopes delivered while the search is being conducted);

f.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates,

i

and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

g.   Documents and records related to or referencing darknet marketplaces, including Dream and Wall Street Market, the monikers "drugpharmacist" and "rickandmortyshop," Easypost, and Shippo;

h.   Documents and records related to cryptocurrency (including Bitcoin), cryptocurrency exchanges, purchases made with cryptocurrency, cryptocurrency wallets, bank records, wire transfers, and other financial transaction records;

i.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

j.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to

ii

Case 2:19-cr-00163-GW   Document 1   Filed 03/05/19   Page 14 of 65   Page ID #:14
Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 5 of 56
Page ID #:74

show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

k.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

l.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Instagram,
Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and
WhatsApp), SMS text, email communications, or other text or
written communications sent to or received from any digital
device and which relate to the above-named violations;

m.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

n.   Contents of any calendar or date book;

o.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations;

p.   Any materials, documents, or records that show
the identity of the person(s) controlling, occupying,
possessing, residing in, or owning the premises being searched,
including rental agreements, leases, rent receipts, deeds,

iii

escrow documents, utility bills and other mailed envelopes reflecting the address and addressee, proof of insurance, or vehicle title and registration; and

      q.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

    2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.   evidence of the attachment of other devices;

      d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      e.   evidence of the times the device was used;

      f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

iv

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

5.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and

vi

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

g.    The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

6.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

a.    Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

viii

Case 2:19-cr-00163-GW   Document 1   Filed 03/05/19   Page 20 of 65   Page ID #:20
Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 11 of 56
Page ID #:80

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) instruct Adan Sepulveda, Jerrell Anderson, Christopher Van Holton, and/or Kenneth Hadley's to depress his thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Adan Sepulveda, Jerrell Anderson, Christopher Van Holton, and/or Kenneth Hadley's face and instruct him or her to hold his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In executing the conditions of this paragraph, law enforcement may not use excessive force, as defined in Graham v.

Case 2:19-cr-00163-GW   Document 1   Filed 03/05/19   Page 21 of 65   Page ID #:21
Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 12 of 56
Page ID #:81

Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Case 2:19-cr-00163-GW   Document 1   Filed 03/05/19   Page 22 of 65   Page ID #:22
Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 13 of 56
Page ID #:82

## AFFIDAVIT

I, JONATHAN M. RAMIREZ, being duly sworn, declare and state as
follows:

### I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of applications for
warrants to search the following persons, premises, and
vehicles, described more fully in Attachments A-1 to A-11,
incorporated herein by reference, for evidence, fruits, and
instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy),
21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute and
Distribution of Controlled Substances), 21 U.S.C. § 843(b) (Use
of a Communications Facility), and 18 U.S.C. § 924(c)
(Possession of a Firearm in Furtherance of a Drug Trafficking
Crime), as further described in Attachment B:

          a.    The person of Adan SEPULVEDA ("SEPULVEDA")
(Attachment A-1);

          b.    The person of Jerrell Eugene ANDERSON
("ANDERSON") (Attachment A-2);

          c.    The person of Christopher Canion VAN HOLTON ("VAN
HOLTON") (Attachment A-3);

          d.    The person of Kenneth Lashawn HADLEY ("HADLEY")
(Attachment A-4);

          e.    20211 Sherman Way, Apartment 242, Winnetka, CA
91306 ("the WINNETKA APARTMENT") (Attachment A-5);

          f.    3246 West Avenue K1, Lancaster, CA 93536 ("the K1
RESIDENCE") (Attachment A-6);

Case 2:19-cr-00163-GW   Document 1   Filed 03/05/19   Page 23 of 65   Page ID #:23
Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 14 of 56
Page ID #:83

g.    29204 Via Estancia, Santa Clarita, CA 91354 ("the VIA ESTANCIA RESIDENCE") (Attachment A-7);

h.    8935 Orion Avenue, Apartment 410, North Hills, CA 91343 ("the ORION AVENUE RESIDENCE") (Attachment A-8);

i.    6734 Andover Avenue, Lancaster CA 93536 ("the ANDOVER AVENUE RESIDENCE") (Attachment A-9);

j.    A 2017 Ford Focus with California license plate 8BPM565 ("FORD"), registered to Melissa Rose White ("White") (Attachment A-10); and

k.    A 2019 Honda Accord with temporary California license plate AD53C42 ("ACCORD"), leased to White and ANDERSON (Attachment A-11).

2.    Attachments A-1 to A-11 and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

II.   **BACKGROUND FOR U.S. POSTAL INSPECTOR JONATHAN RAMIREZ**

4.    I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since June 2017.  Prior to becoming a Postal Inspector, I served as a

police officer with the Orange County Sheriff's Office and the Pasadena Police Department for approximately five years, combined.  As part of my training as a United States Postal Inspector ("USPI"), I completed a 12-week training course in Potomac, Maryland, which included training in the investigation of drug trafficking using the mail.  I am currently assigned to the USPIS Los Angeles Division, Prohibited Mail Narcotics Team. I was previously assigned to a Parcel Task Force (the "Parcel Task Force"), which was comprised of Postal Inspectors and Los Angeles Police Department ("LAPD") officers and detectives.  The Parcel Task Force was responsible for investigating the trafficking of drugs through the United States Mail.  I have also completed a 40-hour LAPD narcotics school training course. Since June 2017, I have participated in multiple investigations into USPS-related violations of the Controlled Substances Act, and I have also discussed my investigations with more-experienced law enforcement officers.  For these reasons, I am familiar with how drug traffickers use the mail to facilitate their trafficking.

### III.  SUMMARY OF PROBABLE CAUSE

5.    Since June 2018, the USPIS, Federal Bureau of Investigation ("FBI") and other agencies have been investigating the "drugpharmacist," a Los Angeles-based darknet marketplace ("DNM") vendor selling methamphetamine, heroin, and other drugs on the marketplaces Dream and Wall Street Market.  Shipments from the drugpharmacist have certain common features – they are shipped in USPS Tyvek envelopes with postage paid (until

recently) by Easypost; inside the Tyvek envelope, there is a
bubble mailer, inside of which there is a stuffed animal and
usually a Thank You card; and inside the stuffed animal, there
is a clear plastic container with the drugs.  To date, USPIS has
identified hundreds of suspected drugpharmacist shipments,
including heroin sent to Knoxville, Tennessee that led to an
overdose death.  The investigation has identified SEPULVEDA,
ANDERSON, VAN HOLTON, and HADLEY as members of the
drugpharmacist drug trafficking organization ("DTO") who have
packaged drugs, mailed drug parcels, and purchased shipping
supplies.  In particular:

- On August 7, 2018, SEPULVEDA mailed parcels, including
the parcel linked to the Tennessee overdose death;

- On August 20, 2018, ANDERSON and VAN HOLTON purchased
packaging supplies; SEPULVEDA mailed multiple parcels, including
one containing 1.3 grams of cocaine base; and VAN HOLTON and
ANDERSON mailed multiple parcels, including one containing 7.7
grams of methamphetamine;

- On August 24, 25, and 26, 2018, VAN HOLTON and
ANDERSON purchased shipping supplies; and

- On September 13, 2018, HADLEY mailed multiple parcels,
including an undercover purchase containing approximately 28
grams of actual methamphetamine.

6.   In addition, undercover purchases, surveillance and
investigation in February and March 2019 show that the
drugpharmacist DTO is still in operation and that ANDERSON and

SEPULVEDA are using the FORD and the HONDA to mail shipments for the drugpharmacist.

7.   SEPULVEDA, ANDERSON, VAN HOLTON, and HADLEY reside at the K1, VIA ESTANCIA, ORION AVENUE, and ANDOVER AVENUE residences, respectively.

### IV.  **STATEMENT OF PROBABLE CAUSE**

**A.   BACKGROUND REGARDING DARKNET MARKETPLACES ("DNMs")**

8.   Based on my training and experience, and my discussions with other law enforcement, I know the following:

a.   DNMs are commercial websites on the internet that function primarily as black markets, by selling or brokering transactions involving drugs, weapons, malware, counterfeit currency, stolen credit card and personal identifying information, forged documents, unlicensed pharmaceuticals, and other illicit goods.  Vendors will often operate on more than one DNM at the same time, usually using the same moniker.  The administrators, vendors and customers on DNMs use specific methods to remain anonymous and avoid detection.

b.   One such method is the use of the TOR network. TOR is a special network of computers on the internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users.  The software needed to use the TOR network is free and easily downloaded from the internet.

c.   Vendors, brokers, and customers on DNMs use cryptocurrency, a digital representation of value that functions

5

as real currency, as a means of payment.  Cryptocurrency

provides users with greater anonymity for online transactions

than traditional currency because the cryptocurrency system is

based on a peer-to-peer network that uses encryption techniques

to regulate the transfer of funds rather than clearing them

through a central bank.  Cryptocurrency can be converted into

traditional currency rapidly and cheaply through the use of

cryptocurrency exchanges with great anonymity and less oversight

than traditional bank payment systems.

          d.    Although many of the interactions between vendors

and customers on DNMs occur online, with respect to vendors

selling drugs, the distribution of those drugs requires the use

of real-world facilities, like the Postal Service, to deliver

the product to customers.  In this way, the offline behavior of

DNM DTOs parallels that of their non-DNM counterparts.

**B.    INVESTIGATION OF THE DNM VENDOR "DRUGPHARMACIST"**

          1.    Initial investigation

9.    On or about June 26, 2018, I was contacted by Lt.

Bryon Rushing of the Cleburne County Sheriff's Office in Herber

Springs, Arkansas.  Lt. Rushing told me the following:

          a.    During a drug investigation, Cleburne County

detectives learned that USPS parcel 9405 5368 9784 6393 3244 79

(the "June Parcel") was mailed from California to their suspect

in Quitman, Arkansas.  Through an interview with the suspect,

detectives learned that the suspect had ordered methamphetamine

on the internet and the methamphetamine was mailed to him in the

June Parcel, which was a USPS Tyvek Envelope containing a small stuffed animal in which the methamphetamine was hidden.

      b.   Detectives seized the parcel packaging and stuffed animal as evidence.  However, they did not recover any methamphetamine as the suspect admitted that he had consumed it earlier.

    10.  Later that day on June 26, 2018, using USPS business records, I researched the June Parcel and learned the following:

      a.   The postage for the June Parcel was purchased online through Easypost[1] by customer/meter number 897846 ("Easypost Customer 897846").[2]

      b.   The return address for the June Parcel was "THE BUY SELL ECOM TEAM, 355 S GRAND AVE STE 2450, LOS ANGELES, CA 90071-9500."  Using a law enforcement database, I learned that the listed business is not located at that address and does not exist in California.

      c.   The June Parcel was processed by USPS in Santa Clarita, CA.

    11.  In July 2018, using USPS records, I located multiple parcels with postage purchased by Easypost Customer 897846 that were similar to the June Parcel and that were also mailed in

---

[1] Easypost is a third party company that provides customers with the ability to pre-pay for postage via the internet and print labels their home/business.

[2] I know from my training and experience that Easypost customer number 897846 is a generic customer number that can be used to purchase postage online.  I also know that this customer number is often used by DNM vendors to facilitate the purchase of postage in exchange for bitcoin from a third-party seller.

June 2018.  The parcels all weighed between 0.56 and 0.62 pounds and had the same postage of approximately $5.29.  Through further research, I also learned that the business names listed in the return addresses were all fictitious, though the recipients' names for some of the parcels did associate with the delivery addresses in the law enforcement database.

12.  On or about July 7, 2018, using USPS business records and Easypost customer number 897846, I identified USPS parcel 9405 5368 9784 6423 2672 64 (the "July Parcel") as a parcel in transit from Porter Ranch, CA to Torrance, CA.  The July Parcel exhibited the following characteristics:

      a.  The postage for the July Parcel was paid by Easypost Customer 897846;

      b.  The postage paid was $5.29;

      c.  The weight of the July Parcel was 0.56 Pounds; and

      d.  The July Parcel was a Tyvek envelope.

13.  I used the law enforcement database to research the return and recipient addresses written on the July Parcel, and learned the following:

      a.  The return address was "Creative Love Innovations, 4455 Murphy Canyon Rd STE 100, San Diego, CA 92123."  I found no record of such a business at that address.

      b.  The recipient address was "Edward A. Harris, 1515 W 207th St. Apt 3, Torrance, CA 90501."  I found a record for such a person at that address.

Case 2:19-cr-00163-GW   Document 1   Filed 03/05/19   Page 30 of 65   Page ID #:30
Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 21 of 56
Page ID #:90

14.   On or about July 9, 2018, I intercepted the July
Parcel at the Torrance Post Office.   Later that day, I saw LAPD
Detective Patrick Foreman and his trained drug-detection dog,
"Jess," examine the exterior of the July Parcel.   Detective
Forman told me that Jess positively alerted to the July Parcel,
indicating the presence of drugs or drug-contaminated items.

15.   On or about July 10, 2018, I went to the recipient
address for the July parcel.   I spoke to Edward Harris
("Harris"), the listed recipient, who said that the July parcel
contained drugs he purchased online on the Wall Street Market
from the DNM vendor "drugpharmacist."   Harris also gave written
consent for me to open the July Parcel and seize its contents.

16.   On or about July 11, 2018, I opened the July Parcel.
Inside, I found a bubble mailer with a stuffed giraffe and a
"Thank You" card inside.   Inside the giraffe, there was a small
plastic container filled with a crystal-like substance that
field tested positive for methamphetamine.

17.   On or about October 23, 2018, I reviewed a report from
the USPIS Forensic Laboratory, from which I learned that the
giraffe in the July Parcel contained approximately 8.27 grams of
98 percent pure methamphetamine.

   2.   July 2018 undercover ("UC") purchase from
        drugpharmacist

18.   Beginning on July 16, 2018 and continuing to the
present, I have spoken on multiple occasions with Fairfax,
Virginia Police Detective Michael Nickolas regarding the

Case 2:19-cr-00163-GW   Document 1   Filed 03/05/19   Page 31 of 65   Page ID #:31
Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 22 of 56
Page ID #:91

drugpharmacist DTO investigation.  From those conversations, I
have learned the following:

> a.  On or about July 17, 2018, while on the Dream
marketplace in an undercover capacity, Detective Nickolas
purchased 3.5 grams of "Bomb Cartel Crystal Super Ice," which
Detective Nickolas understood to be methamphetamine, from
drugpharmacist for $78 in Bitcoin.  Drugpharmacist advertised
the methamphetamine as:

> > Pure Uncut High Quality Crystal Meth, FAST Delivery
> > GRADE It For Yourself
> > Always nice big shards
> > Straight from the Lab!!!
> > CLEAN TASTE, SHARD, LONG LEGS, LONG HIGH
> > GREAT $$ PRICES

> b.  On or about July 20, 2018, Detective Nickolas
received a parcel from the drugpharmacist (the "July UC
Parcel").  The parcel was in a Tyvek envelope with return
address "FOR THE KIDS CREATIONS LLC, 811 WILSHIRE BLVD LOS
ANGELES CA 90017-2606."  Postage was paid by Easypost.  Inside
the parcel, there was a bubble mailer with a stuffed monkey and
a "Thank You" card.  Inside the stuffed monkey, there was a
clear plastic container filled with a crystal-like substance.
Subsequent lab testing found that the substance was
approximately 3.7 grams of 100 percent pure methamphetamine.

19.  Through my review of USPS records, I confirmed that
postage for the UC parcel was paid for by Easypost Customer
897846.

20.  Based on the similarities in the packaging and manner
of shipping, and our training and experience that DNM vendors

Case 2:19-mj-00802-DUTY *SEALED*   Document 2 *SEALED*   Filed 03/04/19   Page 23 of 56
Page ID #:92

often operate on multiple marketplaces (as discussed above),
Detective Nickolas and I concluded that the Dream DNM vendor
drugpharmacist, from whom Detective Nickolas purchased
methamphetamine in July 2018, was the same vendor from whom
Harris purchased methamphetamine on the Wall Street marketplace.

    3. <u>Investigation of the August Parcel</u>

 21. On or about August 2, 2018 I was contacted by the
Chatsworth Post Office regarding approximately 25 Tyvek
envelopes with Easypost postage that were dropped inside a USPS
blue collection bin.  All 25 parcels, including parcel 9405 5368
9784 64475696 41 (the "August Parcel"), had the same return
address: 7119 W. Sunset Blvd, Los Angeles, CA 90046.

 22. On or about August 3, 2018, I examined the parcels at
the Chatsworth Post Office and saw that all 25 parcels had the
following characteristics in common with the June and July
Parcels:

    a. They were all in Tyvek Envelopes;

    b. Postage was paid by Easypost Customer 897846; and

    c. The postage paid for each parcel was
approximately $5.29.

 23. I removed the August Parcel from the mail and released
the remaining 24 parcels in order to avoid alerting the mailer
about this investigation.

 24. On or about August 6, 2018, pursuant to a federal
search warrant (Case No. 18-MJ-2032), I opened the August
Parcel.  Inside I found a bubble mailer, inside of which there
two stuffed bears, a stuffed horse and a "Thank You" card.

Inside each stuffed animal there was a clear plastic container filled with suspected methamphetamine.

25.   On or about October 23, 2018, I reviewed a report prepared by the USPIS Forensic Laboratory regarding the contents of the August Parcel.  From my review of that report, I learned that the August Parcel contained approximately 48.97 grams of 99 percent pure methamphetamine.

4.   <u>A drugpharmacist shipment leads to an overdose death in Knoxville, Tennessee</u>

26.   On or about August 15, 2018, I received information from USPI Wendy Boles in Knoxville, Tennessee regarding USPS parcel 9405 5368 9784 6451 7741 85 (the "TN Parcel"), a parcel mailed from Winnetka, CA that resulted in an overdose death. From our conversation, I learned the following:

a.   On or about August 10, 2018, USPI Boles was contacted by Knoxville Police Department ("KPD") Sgt. Shaffer regarding a drug-related death.  According to Sgt. Shaffer, on or about August 9, 2018, KPD responded to a reported overdose. Upon their arrival, they found the victim, J.W., deceased in the dining room at a desk with a needle, spoon, and ligature lying on the table.  Also on the table was a small clear plastic jar with a lid that contained a folded piece of white paper. Written on the outer surface of the lid in red ink was "2H."  At the end of the desk was a yellow bubble mailer envelope and a USPS Tyvek envelope.

b.   On or about August 10, 2018, using USPS business records, USPI Boles located another parcel with the same return

address as the TN Parcel that had been delivered to another
location in Knoxville ("the second Knoxville parcel").  On or
about August 13, 2018, USPI Boles conducted a consensual
encounter with the recipients of the second Knoxville parcel,
B.I. and Z.S., and learned that the second Knoxville parcel
contained a small quantity of methamphetamine that had been
purchased on a DNM.  Based on B.I. and Z.S.'s description, the
second Knoxville parcel had characteristics similar to prior
drugpharmacist shipments.  Also, the recipient said that the
drugs were inside a stuffed tiger.

   c. On or about August 14, 2018, KPD contacted J.W.'s
mother about whether she found any other items when she gathered
J.W.'s belongings, in particular whether she found any stuffed
animals.  J.W.'s mother said that she saw a stuffed animal that
looked like a tiger and she had disposed of it in the trash
before the police arrived.

  27. On or about August 15, 2018, I reviewed USPS business
records and photos USPI Boles provided to me of the TN Parcel.
From this, I learned that it exhibited the following
characteristics:

   a. It was mailed in a Tyvek envelope;

   b. Postage was paid via Easypost Customer 897846;

   c. The postage paid was approximately $5.29; and

   d. The return address, "MINDFUL CREATIONS INC, 1500
PALMA DR FL2, VENTURA CA, 93003," was fictitious.

13

28.   Furthermore, using the tracking number, I learned the TN Parcel was mailed from the Winnetka Post Office on August 7, 2018.

29.   On or about October 17, 2018, I received the Knox County Regional Forensic Center Autopsy Report for victim J.W. from USPI Boles.   From this report, I learned that the cause of death was classified as "Heroin Toxicity."

30.   On or about August 19, 2018, Detective Nickolas, acting in an undercover capacity, placed an order with the drugpharmacist for approximately 2 grams of black tar heroin.

31.   On or about August 21, 2018, I received the drugs Detective Nickolas ordered, a parcel bearing tracking number 9405 5368 9784 6463 9063 76 ("the August UC Parcel").   The August UC Parcel had the following characteristics:

   a.   It was a USPS Tyvek envelope;

   b.   Postage was paid with Easypost customer 897846;

   c.   Postage paid was approximately $5.29; and

   d.   The return address was the same return address as on the August Parcel, though it was a different business name.

32.   Inside the parcel, I found a yellow bubble mailer. Inside the bubble mailer was a "thank you" card and a stuffed tiger.   Inside the stuffed tiger was a clear plastic container wrapped in tape that had paper and suspected heroin inside.   On top of the lid, in blue ink, was the marking "2H."

33.   On or about October 23, 2018, I reviewed a laboratory report from the USPIS National Forensic Laboratory from which I

learned that the August UC Parcel contained approximately 2.22 grams of heroin.

**C.   SEPULVEDA, ANDERSON, VAN HOLTON, AND HADLEY ARE MEMBERS OF THE DRUGPHARMACIST DTO**

　　　　1.   July 30, 2018 and August 7, 2018 – SEPULVEDA and ANDERSON ship parcels for the drugpharmacist, including the TN Parcel

34.   In late July and early August 2018, through a review of USPS records, I learned that multiple parcels with characteristics similar to drugpharmacist parcels had been mailed from the Tarzana Post Office on July 30, 2018.

35.   On or about August 2, 2018, I reviewed video footage from the Tarzana Post Office for July 30, 2018, and saw the following:

　　　　a.   A white Jaguar XJ sedan (the "Jaguar") drove along the road adjacent to the Tarzana Post Office before parking in the post office parking lot.

　　　　b.   Two suspects ("UM-1" and "UM-2") got out of the Jaguar and carried postal containers filled with USPS parcels in Tyvek envelopes into the post office.

　　　　c.   UM-1 and UM-2 dropped off the parcels in the post office and returned to the Jaguar.  Because the Jaguar was parked out of the view of the camera, I could not see the license plate.

36.   On or about August 7, 2018, I was contacted by employees at the Tarzana and Winnetka Post Offices who told me that more parcels matching the characteristics of the drugpharmacist parcels had been dropped off at those post

15

offices.  I then retrieved video footage from both post offices
for August 7, 2018, which I reviewed and which showed the
following:

        a.   On August 7, 2018, a silver Chevrolet Impala
sedan with license plate number 8CVN090 ("Chevrolet") entered
the Winnetka Post Office parking lot.  UM-1 got out of the
Chevrolet and dropped off parcels in the post office.

        b.   As discussed in greater detail above, I later
learned that the parcels UM-1 dropped off at the Winnetka Post
Office included the TN Parcel, which had resulted in the
overdose death.

        c.   On or about August 7, 2018, the Chevrolet entered
the Tarzana Post Office parking lot.  UM-1 got out and dropped
off multiple parcels inside the post office.

   37.  On or about August 15, 2018, I reviewed California
Department of Motor Vehicle ("DMV") records, from which I
learned that the Chevrolet is registered to Adalaberto Sepulveda
in Lancaster, CA.  I looked at the California driver's license
photograph for A. Sepulveda and concluded that he did not
resemble UM-1 or UM-2.

   38.  On or about August 15, 2018, FBI Special Agent ("SA")
Brent James, Detective Nickolas, and I conducted open source and
social media queries for individuals with the last name
Sepulveda in Lancaster.  By comparing the results of that search

with DMV records and still photos from the surveillance videos discussed above, I was able to identify UM-1 as SEPULVEDA.[3]

39.   On or about August 20, 2018, through further open source and social media investigation, SA James, Detective Nickolas, and I found a music video on YouTube featuring SEPULVEDA and UM-2.   In the video, UM-2 used the moniker "Money Moe Green."   Through further open source and social media queries, we found "Money Moe Green" on ReverbNation, an online marketing platform for musicians.   The listing for "Money Moe Green" included a photo of a man who resembled UM-2 and the following text:

> About the Artist
> Jerrell Eugene Anderson better know (sic) as Money Moe Green born July 23, 1990 in Los Angeles California

40.   Through a review of California DMV records, I located a driver's license photo for ANDERSON and concluded that ANDERSON was UM-2.

### 2.   August 20, 2018 – ANDERSON, SEPULVEDA, and VAN HOLTON ship parcels for the drugpharmacist DTO

41.   Based on my own investigation in this case and my discussions with other USPIS Inspectors and agents from the FBI, I know the following:

a.   On or about August 20, 2018, at approximately 9:00 a.m., a surveillance team saw the Chevrolet parked in the visitor parking lot of an apartment building on Variel Avenue in Woodland Hills (the "Woodland Hills apartment").   Surveillance

---

[3] Based on social media and open source queries, I believe that Adalberto Sepulveda is Adan SEPULVEDA's brother.

agents also saw a white Jaguar sedan parked in the resident
parking lot of the Woodland Hills apartment, which was similar
to the Jaguar I saw on the July 30, 2018 surveillance video.
The white Jaguar in the Woodland Hills apartment parking lot had
license plate number 7JYD788.  I reviewed California DMV records
and learned that the white Jaguar was registered to VAN HOLTON.
I also obtained VAN HOLTON's California driver's license photo
and provided it to FBI surveillance agents, who identified VAN
HOLTON as the driver of the white Jaguar in the Woodland Hills
apartment parking lot.

        b.    At approximately 9:30 a.m., the Chevrolet and the
Jaguar left the Woodland Hills apartment parking lot, driving in
different directions.  The Jaguar drove to the Home Depot across
the street from the Woodland Hills apartment.  At Home Depot,
agents saw VAN HOLTON, ANDERSON and a third man, later
identified as Narvell Anderson,[4] exit the Jaguar and enter the
Home Depot.  Approximately 10 minutes later, all three returned
to the Jaguar.

        c.    Soon after, surveillance agents saw both the
Chevrolet and the Jaguar parked at an apartment building at
20211 Sherman Way in Winnetka.  Both cars remained parked at the
apartment building for the next few hours.  During that time,
agents saw SEPULVEDA, VAN HOLTON, ANDERSON, a then-unidentified
man ("UM-3"), and others on the balcony outside of one of the
apartments.

_____

        [4] Based on social media and open source queries, I believe
that Narvell Anderson is Jerrell ANDERSON's cousin.

        i.    SA James later identified the apartment as apartment 242, i.e., the WINNETKA APARTMENT.

        d.    At approximately 2:35 pm, SEPULVEDA left the WINNETKA APARTMENT carrying a full duffel bag, and VAN HOLTON and ANDERSON left carrying full black trash bags.  All three men loaded the bags into the trunks of the Chevrolet and the Jaguar.  UM-3 walked to a 2005 Buick with California license plate 5LEJ099 (the "Buick").  I reviewed California DMV records and learned that the Buick's registered owner was HADLEY.  I then obtained HADLEY's California driver's license photo and circulated it to surveillance agents who confirmed that UM-3 was HADLEY.

        e.    After the cars were loaded, SEPULVEDA left the parking lot in the Chevrolet, driving west.  VAN HOLTON and ANDERSON left in the Jaguar and drove east.  HADLEY left in the Buick.

        f.    SEPULVEDA stopped at a post office on Sherman Way in Canoga Park (the "Challenger Post Office").  There, SEPULVEDA was seen leaving the post office and placing the duffel bag in the trunk of the Chevrolet.

        g.    Around the same time, the Jaguar drove to the Reseda Post Office where VAN HOLTON and ANDERSON dropped off containers filled with parcels in the lobby.

    42.   On or about August 20, 2018, I conducted follow-up investigation at the Challenger and Reseda Post Offices as follows:

a.   At the Challenger Post Office, I learned that SEPULVEDA had mailed approximately 20 parcels.  I removed one of the parcels (the "Canoga Park Parcel") for further investigation and saw that:

i.   It was contained in a USPS Tyvek Envelope; and

ii.   Postage was paid by Easypost Customer 897846.

b.   At the Reseda Post Office, I learned that VAN HOLTON and ANDERSON dropped off approximately 13 parcels.  I also recovered video footage on which I saw VAN HOLTON and ANDERSON drop off parcels inside the post office.  I removed one of the 13 parcels (the "Reseda Parcel") for further investigation and saw that:

i.   It was contained in a USPS Tyvek Envelope;

ii.   Postage was paid by Easypost Customer 897846; and

iii. The listed return address was the same address as the August Parcel, although there was a different business name listed.

43.   On August 22, 2018, pursuant to a federal search warrant (Case No. 18-MJ-2188), I searched the Canoga Park and the Reseda Parcels and found the following:

a.   Inside the Canoga Park Parcel there was a bubble mailer, inside of which was a stuffed monkey and a "Thank You" card.  Inside the stuffed monkey, there was a small plastic

container filled with a rock-like substance that field tested positive for cocaine base.

     b.   Inside the Reseda Parcel, there was a bubble mailer inside of which there were a stuffed tiger, a stuffed giraffe, and a "Thank You" card.  Inside the giraffe, there was a clear plastic container filled with a black/brown substance that appeared to be heroin.  The container was marked "2H."  Inside the tiger, there was a clear plastic container wrapped with a crystal-like substance inside.

44.  On or about October 23, 2018, I reviewed a lab report from the USPIS forensic laboratory from which I learned the following:

     a.   The Canoga Parcel contained approximately 1.3 grams of cocaine base.

     b.   The Reseda Parcel contained approximately 7.7 grams of 98 percent pure methamphetamine and approximately 0.25 grams of heroin.

45.  In September 2018, I reviewed records provided to me by Home Depot, from which I learned that, on August 20, 2018, ANDERSON, VAN HOLTON, and Narvell Anderson purchased multiple tubes of Rapid Fuse adhesive and Super Glue for $87.11.  I know from my work in this investigation that the drugpharmacist DTO uses a strong adhesive, like Rapid Fuse or Super Glue, to seal the stuffed animals after the container with drugs is placed inside of them.

3.   <u>August 24, 2018 – ANDERSON and VAN HOLTON</u>
<u>purchase shipping supplies from Staples</u>

46.   Based on my discussions with other investigators on
this case, my review of records and surveillance video from
Staples, and my own observations, I know the following:

a.   On or about August 24, 2018, USPIS and LAPD
surveillance officers saw the Jaguar drive to a Staples in
Woodland Hills.  There, they saw VAN HOLTON and ANDERSON walk
out of the Staples store carrying shopping bags.

b.   On or about August 28, 2018, SA James and I spoke
to the manager at the Woodland Hills Staples, who provided SA
James with surveillance video and receipts for August 24, 25 and
26, 2018.  From those, we learned that VAN HOLTON and ANDERSON
purchased shipping supplies on each of those three days,
specifically, ink cartridges, paper, shipping labels, a label
printer, wireless mouse, and mousepad.

c.   On or about August 28, 2018, I reviewed receipts
from Staples from which I learned that, on August 24, 2018, in
particular, VAN HOLTON and ANDERSON purchased 12 Canon brand
black ink cartridges and two packages of Avery brand shipping
labels, for a total of $495.88 in cash.

4.   <u>September 13, 2018 – HADLEY ships a UC parcel for</u>
<u>the drugpharmacist DTO</u>

47.   From my discussions with Detective Nickolas, SA James,
and other law enforcement, my own investigation, and my review
of reports, I know the following:

a.   On or about September 12, 2018, during
surveillance operations at the Woodland Hills Apartment, agents

saw SEPULVEDA and a second man take two black duffel bags out of the Chevrolet and carry them into the apartment complex. Approximately 30 minutes later, agents saw a white Hyundai in the same garage.  The driver of the Hyundai, later identified as HADLEY, then got out of the car carrying a black backpack and entered the apartment complex.

       b.   A short time later, HADLEY returned to the Hyundai and drove to the lower section of the parking garage where he met with VAN HOLTON, who put something in the trunk of the Hyundai and then got into the passenger side.  The Hyundai then drove VAN HOLTON to the Jaguar, which was also parked in the Woodland Hills Apartment garage, where VAN HOLTON got out and got into the Jaguar.  Both cars then left the garage.

       i.   Through a review of California DMV records, I learned that the Hyundai was registered to Robert Moten (DOB 1955) and Catherine Bowden (DOB 1965) at the ANDOVER AVENUE RESIDENCE.

       c.   Also on or about September 12, 2018, Detective Nickolas placed an order on Dream, in an undercover capacity, to buy approximately 28 grams of methamphetamine from "drugpharmacist."  The order was to be mailed on September 13, 2018.

       d.   On or about September 13, 2018, surveillance saw the Chevrolet arrive at the Woodland Hills Apartment.  Three unidentified males exited the car carrying two black duffel bags and entered the apartment complex.  The Jaguar was already parked in the apartment complex garage.  A short time later, the

Hyundai arrived at the Woodland Hills Apartment and parked in
the garage.  HADLEY was driving.  As on the day before, HADLEY
drove to the lower level of the parking garage.  Soon after,
HADLEY left the Woodland Hills Apartment in the Hyundai.
Surveillance agents followed him to a post office in Studio
City.  There, HADLEY exited the HYUNDAI with a black duffel bag,
entered the post office lobby, and placed multiple USPS Tyvek
envelopes in the blue collection bin.

> e.   After the Hyundai left the post office, I went
inside and found approximately 20 parcels in the collection bin,
one of which was addressed to Detective Nickolas' UC address.  In
order to avoid alerting the suspects of the ongoing
investigation, I let the parcels continue in the mail stream.

> f.   On or about September 15, 2018, Detective
Nickolas received a USPS Tyvek envelope from the drugpharmacist.
Inside was a bubble mailer with a stuffed animal and "thank you"
card.  Inside the stuffed animal was a vacuum-sealed bag wrapped
in tape containing a crystal-like substance, suspected to be
methamphetamine.  According to Detective Nickolas, subsequent
lab testing confirmed the substance to be 29.45 grams of 100
percent pure methamphetamine.

> 5.   September 22, 2018 – ANDERSON mails parcels for
> the drugpharmacist DTO

48.   On or about September 22, 2018, I spoke to personnel
at the Chatsworth Post Office and learned that someone had
dropped off 27 parcels at the post office that day.

49.  On or about September 24, 2018, I reviewed an email from the Chatsworth Post Office that contained images of ten of the 27 packages dropped off on September 22.  From my review of those images, I saw that all ten packages: (1) were in USPS Tyvek envelopes, (2) had return addresses I had seen on other suspected drugpharmacist parcels, and (3) had $5.29 in postage paid by Easypost Customer 897846.

50.  On or about September 26, 2018, I reviewed footage from the Chatsworth Post Office for September 22, 2018.  In the footage, I saw the Chevrolet pull into the parking lot at approximately 4:15 a.m.  ANDERSON, who was wearing a light blue track-style jacket, entered the post office and dropped the 27 packages in the blue collection bin in the post office.

      6.  <u>October 12, 2018 – HADLEY delivers parcels for the drugpharmacist DTO</u>

51.  From my discussions with other law enforcement, my review of reports, and my own investigation, I know the following:

      a.  On or about October 12, 2018, surveillance saw the Hyundai leave the Woodland Hills Apartment and drive to the Valley Village Post Office, where surveillance officers saw HADLEY exit the driver side of the vehicle with a large black Nike duffel bag that appeared to contain parcels and enter the post office.  Moments later, HADLEY exited the post office with an empty duffel bag.

      b.  That afternoon, LAPD (acting at the request of the surveillance officers) conducted a traffic stop on the

Hyundai and confirmed that HADLEY was the driver and that the
ANDOVER AVENUE RESIDENCE was HADLEY's current residence.

       c.    Surveillance then followed HADLEY to the Sun
Valley Post Office, where HADLEY entered with a large dark blue
duffel bag that appeared to contain parcels.  Moments later,
HADLEY left the post office with an empty duffel bag and drove
away.

**D.   INVESTIGATION OF "RICKANDMORTYSHOP," THE DNM VENDOR WITH A
SIMILAR MODUS OPERANDI AS DRUGPHARMACIST**

       1.   The FBI Seattle UC purchase from
           "rickandmortyshop"

52.   On or about October 25, 2018, I spoke with FBI SA
Christopher Siliciano about a purchase made in an undercover
capacity by FBI Seattle on Dream from the vendor
"RickandMortyShop."  From that conversation, I learned that, on
or about August 23, 2018, FBI Seattle purchased 2 grams of black
tar heroin from RickandMortyShop.  FBI Seattle received a parcel
on or about August 29, 2018 ("the Seattle Parcel") containing
the purchased drugs.  Through my review of USPS records, I
learned that the Seattle Parcel was in a Tyvek envelope and the
postage was paid by Easypost customer 897846.

53.   On or about October 29, 2018, I logged into the Dream
DNM and searched for "drugpharmacist."  I found the following
message:

     UPDATE 10/27/18:
     I RECOMMEND RICK AND MORTY SHOP UNTIL IM BACK
     !!!!WARNING!!!!  !!!!WARNING!!!!  !!!!WARNING!!!!
     TEMPORARILY NOT ACCEPTING ORDERS WAITING ON SUPPORT RES

UNFORTUNATELY I CAN'T AFFORD TO ACCEPT ORDERS BECAUSE
SUPPORT IS HOLDING MY BITCOINS FOR UNKNOWN REASONS!!!!!!!![5]

54.   On or about October 31, 2018, I reviewed images from
FBI Seattle of the Seattle parcel and learned that the Seattle
parcel had many characteristics in common with drugpharmacist
parcels, namely:

a.   The parcel was a Tyvek envelope;

b.   Inside the Tyvek envelope was a bubble mailer
containing a stuffed animal;

c.   Inside the stuffed animal, there was a clear
plastic container with the marking "2H" on the lid; and

d.   The return address for the parcel was "MINDFUL
CREATIONS INC, 1500 PALMA DR. FL2, VENTURA CA 93003."  I know
from my work in this investigation that this return address was
used on multiple suspected drugpharmacist parcels mailed in
August, including the TN Parcel.

2.   The October UC purchase from RickandMortyShop

55.   Throughout October and November 2018, I spoke with
Detective Nickolas who told me the following:

a.   On or about October 27, 2018, Detective Nickolas
placed an order with RickandMortyShop on Dream for 3.5 grams of
methamphetamine.

---

[5] I know from my training and experience that DNMs provide a
kind of escrow service for customers and vendors through which
payment is held pending receipt of the purchased items.   I
believe that the October 27, 2018 message from drugpharmacist is
a reference to problems drugpharmacist was having receiving
funds from escrow.

b.     On or about October 31, 2018, Detective Nickolas
received a package from "POSITIVE VIBES ECOM LLC 2244 FARADAY
AVE CARLSBAD CA 92008-7208."  This address was the same as the
shipping address on the Canoga Park Parcel shipped by SEPULVEDA
in August 2018.  The postage was paid by Easypost 897846. Inside
the parcel there was a stuffed bear, inside of which there was a
plastic baggie containing a crystal-like substance that field
tested positive for methamphetamine.

c.     According to Detective Nickolas, subsequent lab
testing confirmed the substance to be approximately 3.74 grams
of methamphetamine.

3.   The February UC purchase from "RickandMortyShop"

56.   Through February 2019, I had multiple conversations
with Detective Nickolas, from which I learned the following:

a.     On or about February 21, 2019, Detective Nickolas
conducted an undercover buy for 3.5 grams of methamphetamine
from RickandMortyShop on the Dream marketplace.

b.     On or about February 27, 2019, Detective Nickolas
received a Tyvek envelope from "STUDIO ANTIQUES, 337 Richmond
St, El Segundo CA 90245" with postage paid via Shippo ("the
February RickandMorty UC Parcel").[6]  Inside was a bubble mailer
with a stuffed toy concealing a plastic container with a white

_____

[6] Through my training and experience, I know that Shippo
sells software that allows individuals to pay for postage
online.

crystal-like substance that field tested positive for
methamphetamine.

**E.   THE DRUGPHARMACIST RESUMES OPERATIONS IN LATE NOVEMBER 2018**

57.   On or about November 27, 2018, I logged on to the
Dream marketplace[7] and searched for drugpharmacist.  I found the
following post:

    UPDATE 11/26/18
    !!!!!!!!!!OPEN 4 BUSINESS!!!!!!!!!!!
    !!!!!!!!!!OPEN 4 BUSINESS!!!!!!!!!!!
    !!!!!!!!!!OPEN 4 BUSINESS!!!!!!!!!!!
    !!!!!!!!!!OPEN 4 BUSINESS!!!!!!!!!!!

58.   From my work in this investigation and my discussions
with FBI SA Chris Siliciano, I know that in February 2019, SA
Siliciano made an undercover purchase of methamphetamine from
drugpharmacist on the Dream market.  Specifically:

       a.   On or about January 31, 2019, SA Siliciano
purchased 3.5 grams of methamphetamine on Dream from
drugpharmacist.

       b.   On or about February 6, 2019, SA Siliciano
received a parcel from drugpharmacist.  It was in a Tyvek
envelope with the postage paid through Shippo.

       c.   On or about February 8, 2019, SA Siliciano and I
opened the parcel from drugpharmacist.  Inside, we found a
bubble mailer, inside of which there was a stuffed animal.
Inside the stuffed animal there was a clear plastic container in

---

       [7] Around the same time, I logged into Wall Street Market and
learned that drugpharmacist was no longer operating on the Wall
Street Market.

which there was a crystal-like substance that field tested
positive for methamphetamine.

**F.   RECENT SURVEILLANCE OF ANDERSON AND SEPULVEDA AND
       IDENTIFICATION OF THE FORD AND THE HONDA**

59.   From my discussions with SA James, my own
investigation, and my review of reports, I know the following:

a.   On or about January 6, 2019, SA James spoke to
Hannah Sharitz, Property Director at Twenty 2 Eleven Apartments,
the management company for the WINNETKA APARTMENT.  According to
Sharitz, ANDERSON is the current lessee for the WINNETKA
APARTMENT and the lease runs through March 2019.  Sharitz also
said that ANDERSON no longer lived at the WINNETKA APARTMENT
and, in November 2018, management at the Twenty 2 Eleven
Apartments started eviction proceedings against ANDERSON for
unpaid rent.  During that process, management conducted a
walkthrough of the WINNETKA APARTMENT and saw a safe inside.
However, ANDERSON contacted management in or around January
2019, told them to stop eviction proceedings, and promised to
pay his back rent.  Furthermore, Sharitz said she expected
ANDERSON to come to the WINNETKA APARTMENT the next day (January
7, 2019) to make a rent payment.[8]

b.   On or about January 7, 2019, SA James was
conducting surveillance at the WINNETKA APARTMENT when he saw
ANDERSON arrive in a Nissan Sentra with California license plate

_____

[8] On or about March 3, 2019, I spoke with SA James who told
me that he confirmed with Twenty 2 Eleven Apartments earlier
that day that ANDERSON has continued to make rent payments on
the WINNETKA APARTMENT and is still the current lessee.

7ZDX284.  From DMV records, SA James learned that the car was
registered to Enterprise Rent-a-Car ("Enterprise").

c.   On or about January 9, 2019, SA James contacted
Enterprise and learned that the Sentra was rented to Melissa
White in Stevenson Ranch, CA.  Through subsequent queries in law
enforcement databases and open sources, SA James and I
identified Melissa Rose White, date of birth in May 1990, living
in Stevenson Ranch.

d.   On or about February 1, 2019, SA James contacted
Enterprise again and learned that White had exchanged the Sentra
for a Nissan Altima, Texas license plate KVW0931.

e.   On or about February 12, 2019, through social
media queries, SA James and I found an Instagram account
belonging to Melissa White.  We then reviewed data received from
Instagram pursuant to a federal search warrant (Case No. 18-MJ-
3046) for ANDERSON's Instagram account.  We found chats between
ANDERSON and White, based upon which we concluded that ANDERSON
and White had a personal relationship.

f.   On or about February 26, 2019, SA James learned
that the Nissan Altima was parked near 7177 Pacific View Drive
in Los Angeles, which SA James learned was a property listed on
Airbnb.  Surveillance was then initiated at that location.
During surveillance, agents saw the Altima and the FORD parked
in front of the property.  During surveillance, agents also saw
ANDERSON and SEPULVEDA leave 7717 Pacific View and drive away in
the Altima at different times during the day, along with another

unidentified man ("UM-4"). Agents followed the Altima for a brief period before surveillance was terminated.

g.    On or about February 27, 2019, agents again saw the FORD and the HONDA parked on the street outside 7177 Pacific View. A few minutes after 2 p.m., SEPULVEDA and UM-4 walked out of 7177 Pacific View, each carrying a large black suitcase, and placed the suitcases in the trunk of the FORD before returning inside. Two minutes later, SEPULVEDA and UM-4 left the building again and got into the FORD. At the same time, ANDERSON left the residence and loaded a black Adidas duffel bag and a green backpack into the HONDA. White also left the residence and loaded two black garbage bags and one white garbage bag into the HONDA. ANDERSON and White then got into the HONDA. Both cars left 7177 Pacific View, driving west, with SEPULVEDA driving the FORD and ANDERSON was driving the HONDA. Surveillance followed both the FORD and the HONDA to another location. There, agents saw SEPULVEDA, ANDERSON and UM-4 get out of their cars. Agents also saw the Nissan Altima from 7717 Pacific View arrive. Then the FORD, the HONDA, and the Altima drove away. Agents were not able to identify the drivers of the cars and they were not able to follow the cars. SA James informed me that he believed that the driver of the Altima was using counter-surveillance techniques to evade law enforcement detection.

h.    Later that evening, agents saw ANDERSON and WHITE return the Altima to an Enterprise in Santa Clarita. Still later that evening, agents saw the HONDA parked at the VIA ESTANCIA RESIDENCE.

i.    The next morning, on or about February 28, 2019,
agents saw ANDERSON, White, and a child leave the VIA ESTANCIA
RESIDENCE and get into the HONDA.  Agents did not follow the
HONDA.

j.    Later in the day, on February 28, 2019, cell-site
data for ANDERSON's phone[9] showed that it was in the Glendale
area, but the data did not reveal a specific location.  That
night, however, agents again saw the HONDA parked at the VIA
ESTANCIA RESIDENCE.

k.    On or about March 1, 2019, I reviewed USPS
records and learned that multiple parcels were scanned in the
Glendale area near a blue USPS collection bin that was within
half a mile of the area in which cell-site data showed
ANDERSON's cell phone on the day before.  From my work in this
investigation, I recognized the return address on the parcels as
a return address used on the February RickandMorty parcel that
Detective Nickolas had purchased in an undercover capacity, and
which contained methamphetamine.

60.   On February 14, 2019, in case number 19-MJ-526, I
obtained search warrants for historical cell-site information,
prospective cell-site data, and GPS data for ANDERSON's phone.
Based on my review of that data, I know that from approximately
February 2, 2019 to the present, ANDERSON's phone has
consistently been at or near the VIA ESTANCIA RESIDENCE
overnight.

_____

[9] The data was obtained pursuant to a federal search warrant
in case number 19-MJ-526.

61.   Based on the foregoing, my work in this investigation, and my training and experience, I believe the following:

a.   The drugpharmacist and RickandMortyShop DTOs are related enterprises that are either operated by the same individuals or by individuals sufficiently familiar with each other to use the same operational methods;

b.   Both the drugpharmacist and RickandMortyShop DTOs are ongoing enterprises in which SEPULVEDA, ANDERSON, VAN HOLTON, and HADLEY have been participants, and in which SEPULVEDA and ANDERSON appear to currently be participating;

c.   ANDERSON and SEPULVEDA used 7177 Pacific View to prepare drug shipments in late February 2019, similar to the manner in which they appeared to have used the WINNETKA APARTMENT on August 20, 2018; and

d.   SEPULVEDA and ANDERSON are likely to have computers, phones, and drugs on hand when preparing drug shipments in order to make sure that they are filling customer orders properly.

**G.   IDENTIFICATION OF THE KI, ORION AVENUE, AND ANDOVER AVENUE RESIDENCES**

1.   <u>K1 RESIDENCE</u>

62.   On multiple occasions, in particular on October 26, 2018 and November 30, 2018, and most recently on February 6, 2019, surveillance has seen SEPULVEDA's Chevrolet parked at the K1 RESIDENCE.

63.   On or about February 6, 2019, using USPS records, I verified that SEPULVEDA receives mail at the K1 RESIDENCE.

64.   On or about March 3, 2019, through law enforcement and open source queries, I learned that the K1 RESIDENCE was listed as an address for SEPULVEDA on October 23, 2018 and as a residence for Patrishia Anderson. Through social media and open source queries, I learned that Patrishia is the sister of ANDERSON and girlfriend of SEPULVEDA, with whom she has a child.

2.   ORION AVENUE RESIDENCE

39.   On or about November 13, 2018, using a tracking device installed pursuant to a federal search warrant, surveillance located VAN HOLTON's Jaguar in the parking garage of the ORION AVENUE RESIDENCE.

40.   From my review of records obtained from Verizon pursuant to a federal subpoena, I learned that VAN HOLTON used a cell phone in the name Kourtney Williams. Law enforcement database queries showed the ORION AVENUE RESIDENCE as a current address for Williams. Based on social media and open source queries, I believe that Williams is VAN HOLTON's girlfriend and the mother of his child.

41.   On or about January 4, 2019, FBI conducted surveillance at the ORION AVENUE RESIDENCE, where they saw VAN HOLTON leaving in the Jaguar, before returning later, parking in the same spot in the garage, and entering apartment 410 with shopping bags that appeared to contain groceries.

42.   On or about February 26, 2019, surveillance saw VAN HOLTON's Jaguar parked in the secure garage at the ORION AVENUE RESIDENCE behind a red Volkswagen registered to Kourtney Williams.

### 3.   ANDOVER AVENUE RESIDENCE

65.   From my review of California DMV records, I know that the ANDOVER AVENUE RESIDENCE is the address listed on HADLEY's driver's license.   As indicated above, HADLEY also confirmed that ANDOVER AVENUE RESIDENCE was his address during a traffic stop on October 12, 2018.

66.   On or about February 26, 2019, surveillance saw the Hyundai driven by HADLEY parked in the driveway of the ANDOVER AVENUE RESIDENCE.

67.   On or about March 3, 2019, I conducted a query in law enforcement databases and confirmed that the ANDOVER AVENUE RESIDENCE is still HADLEY's listed residence.

**H.   PROBABLE CAUSE TO BELIEVE THAT ANDERSON AND VAN HOLTON POSSESS FIREARMS**

68.   On or about November 15, 2018, in case number 18-MJ-3046, I obtained a search warrant for Instagram accounts belonging to VAN HOLTON and ANDERSON.   On or about December 5, 2018, I received the results of that search warrant.   Based on my review of the returns, I know the following:

a.   On or about June 24, 2018, ANDERSON posted a photo captioned "Slight Work""Thug L!fe."   The photo depicted a duffel bag on a counter, currency, multiple cell phones, car keys, and a black handgun.

b.   On or about July 21, 2018, ANDERSON posted a photo of a collection of hats with what appeared to be a rifle on a counter with an emoji and the caption "DOPE."

     c.   On or about June 24, 2018, VAN HOLTON posted a photo of himself on a phone with a gun on the counter next to him.

## V.  TRAINING AND EXPERIENCE ON DRUG TRAFFICKING OFFENSES

   69.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

     a.   Drug trafficking is a business that involves numerous co-conspirators, from brokers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

     b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, cryptocurrency records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs, and the proceeds of those transactions, including purchases made with drug proceeds. Drug dealers who use cryptocurrency often exchange cryptocurrency for cash and keep records related to those transactions as well.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   DNM vendors communicate with customers by text
message, social media messaging applications, and email.  And
communications between DNM vendors, brokers and suppliers take
place by telephone calls and messages sent to and from cell
phones and other digital devices.  This includes sending photos
or videos of the drugs between the seller and the buyer, and the
negotiation of price.  In addition, it is common for people
engaged in drug trafficking to have photos and videos on their
cell phones of drugs they or others working with them possess,
as they frequently send these photos to each other and others to
boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence.  Drug traffickers
often keep records of meetings with associates and suppliers on
their digital devices and in their residence, including in the
form of calendar entries and location data.

e.   Drug traffickers often use cars to transport
their drugs.

f.   Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate
on a cash basis.  Such currency is often stored in their
residences and vehicles.

g.   Drug traffickers often keep drugs in places where
they have ready access and control, such as at their residence
or in safes.  They also often keep other items related to their

drug trafficking activities at their residence, such as digital
scales, packaging materials, and proceeds of drug trafficking.
These items are often small enough to be easily hidden and thus
may be kept at a drug trafficker's residence even if the drug
trafficker lives with others who may be unaware of his criminal
activity.

        h.    It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

        i.    Drug dealers often keep guns at hand, to protect
their drugs and their cash, especially when engaged business
directly related to drug dealing, like packaging drugs for
shipment or sale.

## VI.  PROBABLE CAUSE FOR A "NO KNOCK" WARRANT FOR ANDERSON

    70.  As discussed above, there is probable cause to believe
that ANDERSON is currently engaged in the business of packaging
and mailing drugs for the drugpharmacist DTO.  In addition,
there is probable cause to believe that ANDERSON possesses at
least one firearm and that he is likely to keep his firearm
close at hand while engaged in drug-related business, like
packaging customer orders for shipment.  Because announcing the
presence of law enforcement executing a warrant is likely to

give ANDERSON sufficient time to potentially arm himself prior to law enforcement entry, thereby increasing the danger both to entering agents and to the public, I am requesting permission to execute this warrant as a "no knock" warrant and to allow executing agents and officers to enter premises to search ANDERSON without first announcing their presence.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[10]

71.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

> a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[10] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

72.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

73.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) instruct SEPULVEDA, ANDERSON, VAN HOLTON and/or
HADLEY to depress his thumb- and/or fingers on the device(s),
and direct which specific finger(s) and/or thumb shall be
depressed; and (2) hold the device(s) in front of SEPULVEDA,
ANDERSON, VAN HOLTON and/or HADLEY's face and instruct him to

43

hold his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### VIII.     CONCLUSION

74.  For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachments A-1 to A-11.

JONATHAN M. RAMIREZ, Postal
Inspector
U.S. Postal Inspection
Service

Subscribed to and sworn before me
this 4th day of March, 2019.

HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE